OPINION
{¶ 1} This is an appeal from a judgment of the court of common pleas that affirmed a decision of the Unemployment Compensation Review Commission denying employment compensation benefits. Upon review, we find no error in the trial court's decision, and therefore will affirm the judgment from which the appeal was taken.
 {¶ 2} Plaintiff-Appellant, Andrea Ashwell, is one of 482 claimants for unemployment compensation benefits who were employed by General Motors Corporation at its manufacturing facilities in Dayton in 1998. The claimants were also members of the United Auto Workers (UAW) labor union. The terms and conditions of their employment by GM were governed by a National Collective Bargaining Agreement ("National Agreement") between GM and the UAW dated November 2, 1996.
 {¶ 3} The National Agreement contains several provisions pertinent to the matters at issue in the appeal. Under the heading "Vacation Time Off Procedure," paragraph (202) of the National Agreement provides:
 {¶ 4} "Management recognizes the desirability of providing vacation time off with pay, up to the vacation entitlement to which the employee's seniority will entitle them on December 31 of the current year, in a manner that preserves the maintenance of efficient operations while giving consideration to the desires of the employee.
 {¶ 5} "(202a) During each year of this Agreement, the Corporation has designated the following days to be included in an Independence Week Shutdown period:

 1997
 "Monday, June 30 — Independence Week
 Shutdown Day
 "Tuesday, July 1 — Independence Week
 Shutdown Day
 "Wednesday, July 2 — Independence Week
 Shutdown Day
 "Thursday, July 3 — Independence Week
 Shutdown Day
 1998
 "Monday, June 29 — Independence Week
 Shutdown Day
 "Tuesday, June 30 — Independence Week
 Shutdown Day
 "Wednesday, July 1 — Independence Week
 Shutdown Day
 "Thursday, July 2 — Independence Week
 a. hutdown Day
 1999
 "Tuesday, July 6 — Independence Week
 Shutdown Day
 "Wednesday, July 7 — Independence Week
 Shutdown Day
 "Thursday, July 8 — Independence Week
 Shutdown Day
 "Friday, July 9 — Independence Week
 Shutdown Day"
 {¶ 6} "(202d) Employees who are not scheduled to work during any portion of the Independence Week Shutdown Period shall be paid up to eight (8) hours of pay for each of the Independence Week Shutdown Period days they are not scheduled to work, up to a maximum of thirty-two (32) hours, which will be calculated on the basis of the employee's regular rate of pay, plus attached night shift premium, not including overtime, as of the employee's last day worked prior to the Independence Week Shutdown period provided:
 {¶ 7} "(1) The employee has seniority in any General Motors plant as of the date of each of the Independence Week Shutdown Days,
 {¶ 8} "(2) The employee is on the active rolls and would otherwise have been scheduled to work if it had not been observed as an Independence Week Shutdown Day,
 {¶ 9} "(3) The employee works their last scheduled work day in the pay period prior to and their next scheduled work day in the pay period after the pay periods of Independence Week Shutdown and Plant Vacation Shutdown Week.
 {¶ 10} "Employees shall receive such pay in the pay period following the Independence Week Shutdown Period.
 {¶ 11} "(202e) Failure to work either their last scheduled work day in the pay period prior to or their next scheduled work day in the pay period after the pay periods of the Independence Shutdown and Plant Vacation Shutdown Week will disqualify the employee for Independence Week Shutdown days which follow or precede such scheduled work day."
 {¶ 12} At paragraph (203), the National Agreement provides that "[e]mployees shall be paid for specified holidays" in the years 1996, 1997, 1998, and 1999 following the effective date of the National Agreement. One of holidays specified is July 4, 1998. The paragraph further provides that employees will be paid "providing they meet all of the following eligibility rules unless otherwise provided herein:
 {¶ 13} "(1) The employee has seniority as of the date of each specified holiday and as of each of the holidays in each of the Christmas holiday periods, and
 {¶ 14} "(2) The employee would otherwise have been scheduled to work on such day if it had not been observed as a holiday, and
 {¶ 15} "(3) The employee must have worked the last scheduled work day prior to and the next scheduled work day after each specified holiday within the employee's scheduled work week. For each Christmas holiday period, the employee must have worked the last scheduled work day prior to each holiday period and the next scheduled work day after each holiday period."
 {¶ 16} In early 1998, employees at other GM facilities that produced parts for the Dayton GM plants went on strike. This eventually resulted in a shortage of parts at the Dayton plants. Production at the Dayton plants was halted, and beginning June 5, 1998, Plaintiff-Appellant and the other claimants were laid off by GM for lack of work. They were not recalled by GM and did not return to work until various dates following August 1, 1998. They received their first regular paychecks on August 13, or 14, 1998.
 {¶ 17} As a part of the settlement agreement that ended the strikes at the other GM plants, GM and the UAW entered into a Memorandum of Understanding ("MOU") dated July 28, 1998. It provides:
 {¶ 18} "Memorandum of understanding one time special payment
 {¶ 19} "As a result of these negotiations and without prejudice to the position taken by either party, and without setting any precedent in the disposition of any other case involving similar circumstances, the parties agree to the following:
 {¶ 20} "Employees who were on strike or layoff status at General Motors locations due to the labor dispute at the Flint Metal Center and Delphi E. Flint East and who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM-UAW National Agreement, shall receive a one time special payment in the amount they would have been entitled to had they not been on strike or layoff."
 {¶ 21} "This payment will be made in an expeditions manner and taxed as a regular wage payment in accordance with Document No. 81 of the GM-UAW National Agreement.
 {¶ 22} "This payment shall initially be made by General Motors. Thereafter, payments otherwise required by Paragraph IIIA of the Memorandum of Understanding Joint Activities, 1996 GM-UAW National Agreement, shall be waived until General Motors is reimbursed for the total amount paid to employees as a result of this Memorandum.
 {¶ 23} "Further, the parties recognize that these payments may result in employees being ineligible for unemployment compensation already received. Employees impacted by such overpayment of unemployment compensation will be responsible to repay the State that provided the unemployment compensation.
 {¶ 24} /s//s/
 {¶ 25} International Union, UAW General Motors Corporation"
 {¶ 26} It is undisputed that, because they were in lay-off status, Plaintiff-Appellant and the other claimants could not satisfy the condition imposed by the National Agreement that they must have worked the shifts prior to and following the four day Independence Week Shutdown and the July 4 holiday in 1998 in order to be paid for the five days concerned. It is also undisputed that, by reason of the MOU, employees were paid amounts which they would have received for that same five-day period, and that the amount each was paid was in excess of the unemployment compensation for which each would have been eligible for the five days. Regular payroll deductions were made from the One Time Special Payment by GM, except for union dues, which were not payable during layoff. The employees also received seniority credits for the period.
 {¶ 27} Plaintiff-Appellant and the other claimants became eligible to receive unemployment compensation benefits when they were laid off by GM, from the date each was laid off until he or she was recalled to work. GM subsequently objected to payment of benefits for the period June 29 through July 3, 1998, arguing that the One Time Special Payment each claimant received pursuant to the MOU was remuneration that disqualified them from receiving benefits. On review, the Director of the Department of Job and Family Services ("Director") agreed and disallowed benefits for the period June 29 through July 3, 1998.
 {¶ 28} The claimants, including Plaintiff-Appellant, appealed the Director's decision to the Unemployment Compensation Review Commission ("Commission"). On December 12, 2002, the Commission rendered a decision disallowing benefits for the period concerned pursuant to R.C.4141.31(A)(5). In its decision, the Commission stated:
 {¶ 29} "The question to be determined by the Review Commission is whether the monies received by claimants are deductible as remuneration in the form of holiday pay. This special payment was negotiated by General Motors Corporation and the United Auto Workers. The weight of the evidence before the Review Commission is that the purpose of this payment was to replace the lost Independence Week Shutdown Period pay and Independence Holiday pay. Certain prerequisites for receiving this pay could not be met by employees because of the strikes and layoff situations existing at the time. In the negotiation process, it appears that the parties agreed to waive these impossible prerequisites and pay the unemployed workers a special payment calculated to make them whole for loss of the holiday payments. Deductions were made by the employer in the same manner as regular holiday payments would have been handled and employees received credit, including additional vacation entitlement, under the National Agreement for these monies. The circumstances which allowed the employer to recoup these monies via reduced contributions to another fund does not alter the nature of the payments. That the parties believed and intended these payments to replace the Independence Week Holiday pay is evidenced by Employer Exhibit #1, Shop Committee-Information Flyer, issued August 5, 1998, wherein the following statement was made:
 `Independence Week Holiday Pay {¶ 30} `The International Union and Corporation have agreed to pay the negotiated settlement concerning the Independence Week Shutdown Week. This payment will be included in the regular payroll checks on August 14, 1998. Even though you only receive one check, taxes will be deducted from the individual amounts of the two weeks, as per your regular payroll tax status.'
 {¶ 31} "Based upon the weight of the evidence before the Review Commission, it is held that the Director properly disallowed all claims for the weeks in issue because claimants received remuneration in the form of holiday pay or allowance in excess of their weekly benefit amount." (Decision, pp. 8-9).
 {¶ 32} The claimants appealed the Commission's decision to the court of common pleas. The court found that the MOU modified the terms of the National Agreement by waiving its requirements that the claimants work the shifts before and after the Independence Week Shutdown and Holiday in order to be paid for the five days concerned. The court noted that such an intent is manifested in the flyer quoted in the Board's decision. On that basis, the court held that the pay the claimants received was "remuneration" for vacation or holiday which was allocated to that week, and per R.C 4141.31(A)(5) the amount of unemployment compensation benefits otherwise due each claimant must be reduced by the amount of the One Time Special Payment each claimant received. Therefore, the court affirmed the Commission's decision.
 {¶ 33} Plaintiff-Appellant Ashwell filed a timely notice of appeal on her behalf and on behalf of the other 481 claimants. Plaintiff-Appellant presents five assignments of error, which state:
First Assignment of Error
 {¶ 34} "The trial court erred in affirming the decision of the review commission denying benefits to claimants, because they were totally unemployed under revised code section 4141.01(m)."
Second Assignment of Error
 {¶ 35} "The trial court erred in affirming the decision of the review commission denying benefits to claimants, because the one-time special payment was not holiday pay under section 4141.31(A)(5) and could not be allocated to the week ending July 4, 1998."
Third Assignment of Error
 {¶ 36} "The trial court erred affirming the decision of the review commission denying benefits to claimants, where the special payment was a form of bonus, that could not be used to reduce benefits under section4141.31(A)(5)."
Fourth Assignment of Error
 {¶ 37} "The trial court erred in affirming the decision of the review commission denying benefits to claimants, because the special payment was not remuneration under revised code section 4141.01(H)"
Fifth Assignment of Error
 {¶ 38} "The trial court did not liberally construe under R.C.4141.46 the appellants' claims for unemployment benefits."
 {¶ 39} Because the contentions which these assignments involve present intertwined issues of fact and law on the record before us, they will be considered together.
 {¶ 40} We begin our review of these issues with two observations. First, Ohio's system of unemployment compensation is a statutory scheme, R.C. Chapter 4141, and as such a claimant's eligibility for benefits is governed by statute. Second, there is no dispute concerning the existence of the facts on which the Commission and the common pleas court based their decisions, because the parties stipulated to them. The only issue is whether either tribunal erred when it applied governing statutory law to the facts concerned.
 {¶ 41} R.C. 4141.282(A) provides: "Any interested party, within thirty days after written notice of the final decision of the unemployment compensation review commission was sent to all interested parties, may appeal the decision of the commission to the court of common pleas." The standard of judicial review applicable to an R.C. 4141.282(A) appeal was set out by the Supreme Court in Tzangas, Plakas Mannos v.Administrator, Ohio Bureau of Employment Services (1995),73 Ohio St.3d 694:
 {¶ 42} "In Irvine v. Unemp. Comp. Bd. of Review (1985),19 Ohio St.3d 15, 17-18, 19 OBR 12, 15, 482 N.E.2d 587, 590, this court held that reviewing courts may reverse `just cause' determinations `if they are unlawful, unreasonable, or against the manifest weight of the evidence.' This court noted that while appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record. Id. at 18, 19 OBR at 15,482 N.E.2d at 590. This duty is shared by all reviewing courts, from the first level of review in the common pleas court, through the final appeal in this court." Id at p. 696.
 {¶ 43} R.C. 4141.29 states: "Each eligible individual shall receive benefits as compensation for loss of remuneration due to involuntary total or partial unemployment in the amounts and subject to the conditions stipulated in this chapter." "An individual is `totally unemployed' in any week during which the individual performs no services and with respect to which no remuneration is payable to the individual." R.C. 4141.01(M). "`Remuneration' means all compensation for personal services, including commissions and bonuses and the cash value of all compensation in any medium other than cash . . ." R.C. 4141.01(H)(1). These provisions "shall be liberally construed" in favor of the applicant for benefits. R.C. 4141.46; Vspremi v. Giles (1980), 68 Ohio App.2d 91.
 {¶ 44} It is undisputed that the claimants performed no actual work for GM for the One Time Special Payment each received. However, as "personal services" appears in the definition of remuneration in R.C.4141.01(H)(1), it is not limited to engaging in some productive activity. United Steelworkers of America AFL-CIO v. Doyle (1958),168 Ohio St. 324. When a laid-off employee retains his status as an available employee, retains his seniority, pension rights and any right to severance pay, and registers and reports for state compensation, any compensation he is paid by his employer is for his services. Id. Thus, personal service "means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." Id., at p. 327, quoting Social Security Boardv. Nierotko (1946), 327 U.S. 358, 66 S.Ct. 637, 641, 90 L.Ed. 718.
 {¶ 45} There is no dispute that claimants retained many if not all of the features of their employment relationship with GM while they were laid off from work. Therefore, the One Time Special Payment the claimants received from GM was compensation for personal services under the rule ofDoyle. Per R.C. 4141.01(M), for claimants to have been "totally unemployed" and entitled to benefits as a result, the payment cannot have constituted a form of "remuneration," as remuneration is defined by R.C.4141.01(H)(1).
 {¶ 46} In finding against the claimants, the Commission relied on R.C. 4141.31(A)(5), which states: "Benefits otherwise payable for any week shall be reduced by the amount of remuneration a claimant receives with respect to such week as . . . [v]acation pay or allowance payable under the terms of a labor-management contract or agreement, or other contract of hire, which payments are allocated to designated weeks."
 {¶ 47} The Commission found, on the weight of the evidence presented, that the purpose of the One Time Special Payment was to replace the lost Independence Week Shutdown and Holiday pay, which was itself allocated to designated weeks. The trial court went farther, holding that the MOU modified the National Agreement to permit payments of the Independence Week Shutdown and Holiday pay for which the National Agreement otherwise provided.
 {¶ 48} We do not agree that the MOU amended the National Agreement so as to modify its terms. The National Agreement is a written contract, and written contracts may be modified or amended by express agreement of the parties to the contract, either in writing or by parol. Hotchner v. NeonProducts (1947), 163 F.2d 672. The MOU expresses no intention to modify the National Agreement, however.
 {¶ 49} A modification may also be implied by the subsequent acts of the parties that demonstrate a meeting of the minds in agreement to modify its terms on any particular point. Smaldino v. Larsick (1993),90 Ohio App.3d 691. The MOU provides that employees "shall receive a one time special payment in the amount they would have been entitled to had they not been on strike or layoff." That references the requirements of the National Agreement, but it doesn't modify them. Instead, it creates a new and separate right, which is what the Commission in its decision found.
 {¶ 50} We agree with the Commission that the issue of eligibility for benefits in the present case turns on the application of R.C.4141.31(A)(5); specifically, whether the One Time Special Payment was a form of remuneration because it was "[v]acation pay or allowance . . . which payments are allocated to designated weeks." The Commission found that it was, with respect to the work week beginning June 29, 1998 through July 3, 1998. Such questions present issues of fact which are matters the Commission must determine. Stoll v. Owens Brockway GlassContainer, Inc., Lucas App. No. L-02-1049; 2002-Ohio-3822. Our task is to determine whether the Commission's decision is "unlawful, unreasonable, or against the manifest weight of the evidence." Tzangas.
 {¶ 51} Strictly speaking, the claimants were not on "vacation" during the work week June 29 through July 3, 1998. They were instead laid-off from work. The claimants argue that, on that basis, the One Time Special Payment cannot be remuneration in the form of vacation pay or allowance for purposes of R.C. 4141.35(A)(5), as both the Commission and the common pleas court found. Claimants rely on Budd Co. v. Mercer (1984),14 Ohio App.3d 269.
 {¶ 52} In Budd, employees who were laid off for lack of work were paid accrued vacation pay for the period pursuant to a labormanagement agreement. Unemployment compensation benefits were nevertheless allowed. The Sixth District Court of Appeals affirmed, reasoning that the claimants could not be both totally unemployed, which the employer had conceded, and on vacation. The court held that the payments were instead a bonus which is not a form of payment which R.C. 4141.35(A)(1)-(5) identifies as "remuneration."
 {¶ 53} We decline to follow and apply the rule of Budd. The issue presented is whether these claimants are entitled to unemployment compensation benefits because they were totally unemployed for the week concerned. "An individual is `totally unemployed' in any week during which the individual performs no services with respect to which no remuneration is payable to the individual." R.C. 4141.01(M). Under the rule of Doyle these claimants performed personal services for GM during the work week of June 29 through July 3, 1998, because during that period their relationship with GM was maintained in various ways. Further, and more importantly, per R.C. 4141.04(H)(2) a "bonus" is a form of remuneration. Therefore, payment of a bonus renders an employee, even one who is laid-off, ineligible for benefits because he is not then unemployed. In that event, whether the bonus was allocated to designated weeks as vacation pay is immaterial.
 {¶ 54} The Director of Job and Family Services is authorized by R.C.4141.13(C) to "[a]dopt rules with respect to the collection, maintenance, and disbursement of the unemployment and administrative funds." Such rules must be approved by the Unemployment Compensation Review Commission before they become effective. R.C. 4141.14(A). Rules thus adopted and approved are set out at O.A.C. Chapter 4141-9.
 {¶ 55} Acting on the authority conferred by R.C. 4141.13(C), the Director adopted and the Commission has approved rules which have a bearing on the issue presented. O.A.C 4141-9-04(B) provides, in pertinent part: "Remuneration may be . . . denominated by terms such as vacation pay or allowance, separation pay, holiday pay, paid absence allowance, downtime paid absence allowance, or short workweek pay." The sense of the rule is that the terms set out are typical and illustrative, not all inclusive or limiting. The Commission could therefore reasonably find that the One Time Special Payment is likewise remuneration in the form of vacation pay or allowance, so long as it is "allocated to designated weeks." R.C. 4141.31(A)(5).
 {¶ 56} Another rule adopted by the Director and approved by the Commission that offers guidance in deciding the question presented is O.A.C. 4141-9-05(A), which states, in pertinent part: "Remuneration in the form of holiday pay will be applied to the week during which the holiday occurs as specified by state or national declaration, regardless of when such remuneration is actually received. If, however, there exists a written labormanagement agreement to observe a holiday on a date other than the one specified by state or national declaration, the holiday pay will be applied to the week during which the date specified in the agreement occurs."
 {¶ 57} The Independence Week Shutdown pay period identified in the National Agreement is the period of Monday, June 29 through Thursday, July 2, 1998. One of the holidays for which payment is specified by the National Agreement is July 4, 1998. The July 4 holiday was observed on Friday, July 3 in 1998. The MOU provides that eligible employees "shall receive a one time special payment in the amount they would have been entitled to receive had they not been on strike or layoff" during the Independence Week Shutdown and Holiday. Per O.A.C. 4141-9-05(A), the pay for the Independence Day holiday necessarily must apply to July 3, 1998, the last day of the Independence Week Shutdown and Holiday period that year.
 {¶ 58} The foregoing provisions support the conclusion of the Commission and the common pleas court that the One Time Special Payment was a form of vacation pay. The further question is whether, as vacation pay, it was allocated to the designated work week of June 29 through July 3, 1998.
 {¶ 59} To "allocate" means "to apportion for a specific purpose or to particular persons or things." Webster's Third International New Dictionary. Here, the One Time Special Payment was apportioned by recipient and amount to persons who, but for their inability to work the required prior and subsequent shifts because of the layoff, would have been entitled to receive Independence Week Shutdown and Holiday Pay in 1998 for the week designated. Therefore, the Commission could reasonably find, as it did, that the One Time Special Payment was allocated to the week designated. On the standard of review we are required by Tzangas to apply, we cannot find that the Commission's decision was unreasonable, unlawful, or against the manifest weight of the evidence.
 {¶ 60} Plaintiff-Appellant argues that the decision denying the claimants' unemployment compensation benefits should be reversed on other grounds, however.
 {¶ 61} First, Plaintiff-Appellant argues that the One Time Special Payment cannot be allocated to the work week of June 30 through July 3, 1998, because it was not paid until August 13 or 14, 1998. We are urged to adopt and follow the distinction in that regard on which the court inGeneral Motors Corporation v. Buckner (2001), 49 S.W.3d. 753, held that unemployment compensation claims arising under these very same circumstances should be paid.
 {¶ 62} Buckner was decided by the Missouri Court of Appeals on the basis of the statutory law of Missouri governing unemployment compensation benefits. The relevant statutory provisions state that an individual is deemed totally unemployed in any week during which he performs no services "and with respect to which no wages are payable to such individual." Section 288.030.1(26)(a), RSMO (2000). Further, Section288.036.1 RSMO (2000) provides: "Vacation pay and holiday pay shall be considered as wages for the week with respect to which it is payable."
 {¶ 63} The Buckner court reasoned that the One Time Special Payment was not "payable" for the Independence Week Shutdown and Holiday in 1998 because the employees acquired no legal right to it until the MOU was signed subsequent to that week on July 28, 1998, and that it did not become "payable" until August 9, 1998, after the employees had returned to work. The court found the one time special payment could therefore not have been "payable" for the work week ending July 3, 1998, and for that reason could not be wages payable for that week that disqualified the employees from receiving unemployment compensation benefits.
 {¶ 64} Unlike Missouri's, Ohio's statutory scheme for providing unemployment compensation benefits takes no account of when compensation that might constitute remuneration becomes "payable." Indeed, O.A.C. 4141-9-05 expressly rejects that consideration with respect to holiday pay. Further, as the Buckner court also observed, "[d]ue to the fact that the types of statutes involved in the various states are not uniform but frequently divergent, we do not consider authorities from other jurisdictions decisive of this matter." Id., at p. 759.
 {¶ 65} The fact that, per the terms of the MOU, the One Time Special Payment was not payable or paid until a later date does not demonstrate that the agreement allocated it to a period other than the work week of June 29 through July 3, 1998. The Commission could, as we have said, reasonably find that the MOU allocated the payment to that week, and that it therefore constitutes remuneration for purposes of R.C. 4141.31(A)(5).
 {¶ 66} Plaintiff-Appellant's second contention is the One Time Special Payment cannot constitute remuneration for purposes of R.C. 4141.31(A)(5) under the rule of Akzo Salt, Inc. v. Ohio Bureau of Employment Services
(1995), 107 Ohio App.3d 567.
 {¶ 67} In Akzo Salt, employees were likewise laid off during a shutdown unilaterally imposed by the employer for economic reasons. A labor-management agreement authorized payment of an employee's unused vacation time in that event. The Sixth District Court of Appeals held that such payments could not be remuneration, as it is defined by R.C.4141.31(A)(5), unless the employee had scheduled vacation leave during the shut-down period, because absent that it could not have been "allocated to (those) designated weeks." Id However, if the employee had scheduled his or her vacation during the period, the payment was allocated and constituted remuneration.
 {¶ 68} The circumstance in Akzo Salt is one that R.C. 4141.31(A)(5) was intended to prevent. There, and acting on the authority conferred by a labor-management agreement, the employer unilaterally attempted to allocate compensation payable for a vacation benefit as remuneration for the period in which it was paid, even though those particular weeks had not been designated for receipt of the payment by the same labor-management agreement. Therefore, no allocation was shown. In the present case, the Commission found that the MOU, which is undisputably a labormanagement agreement, specifically allocated the payment to a designated week. We have found that the Board's decision is not unlawful, unreasonable, or against the manifest weight of the evidence. Therefore, we may not reverse. Tzangas.
 {¶ 69} As a third contention, Plaintiff-Appellant argues that the One Time Special Payment should not be viewed as remuneration because the MOU allows GM to divert monies it is otherwise required by contract to commit to other employees benefits to the payment it is required by the MOU to make, until GM is fully reimbursed for the One Time Special Payments it made.
 {¶ 70} R.C. 4141.35(A)(5) takes no account of the source of vacation pay or allowances, so long as the amount is payable under the terms of a labor-management agreement and allocated to designated weeks. Reliance on the fact that the payment is the product of a labor-management agreement, as it was here, demonstrates that questions such as the source, amount, or payment terms are matters committed to the negotiating process, not ones that affect the application of R.C. 4141.35(A)(5).
 {¶ 71} Fourth, Plaintiff-Appellant argues that the Commission and the common pleas court abused their discretion when they relied on the flyer quoted in the Commission's decision to determine the intent of the parties who executed the MOU. We do not agree.
 {¶ 72} The intent of the parties who executed a written agreement must be determined from its terms, unless those terms are so ambiguous as to make their intent unclear. The court may then hear and consider other evidence, parol evidence, in order to make the determination required.
 {¶ 73} The MOU is ambiguous, or at least unclear. In that event, the Commission and the common pleas court were authorized to consider other evidence relevant to show what the intent of the parties was.
 {¶ 74} The flyer was prepared by a member local union of the UAW and circulated to UAW members of that local union. There is no evidence that those who prepared it had been a part of the negotiations leading to the MOU. However, as a declaration concerning the MOU, the flyer is relevant to prove the intent of the parties who drafted the MOU. It is therefore admissible for that purpose per Evid.R. 402, unless its admission is other barred.
 {¶ 75} The real contention, we believe, is that the flyer is mere hearsay, and therefore barred by Evid.R. 802. However, Evid.R. 801(D)(2)(d) provides that a statement is not hearsay when it is an admission by a party-opponent in the form of "a statement by his agent or servant concerning a matter within the scope of his agency or employment made during the existence of the relationship."
 {¶ 76} There is no dispute that the flyer was issued by a UAW local to UAW members who were laid off and eligible for the One Time Special Payment prescribed by the MOU. The requirements of Evid.R. 801(D)(2)(a) are satisfied. Therefore, the Commission and the court did not abuse their discretion in considering the statements in the flyer in order to determine the intent of the parties who executed the MOU. What weight to give those statements is a question for the Commission.
 {¶ 77} Finally, Plaintiff-Appellant argues that the Commission ignored the injunction of R.C. 4141.46 that the sections of R.C. Chapter 4141 "shall be liberally construed." By that it is meant that any material doubts must be resolved in favor of coverage. Vspremi v. Giles. However, that does not affect the deference due to the trier of fact on judicial review of its decision. Miller v. Franklin Chemical Industries (August 23, 1984), Scioto App. No. 1460.
 {¶ 78} The MOU, which was the product of a negotiated agreement, was unclear with respect to what type of compensation the One Time Special Payment actually was. The Commission was charged by law to resolve lack of clarity, and in doing so found that it was vacation pay allocated to a designated week. The Commission had before it the history of the parties' relations exemplified in the National Agreement, the specific reference in the MOU to the 1998 Independence Week Shutdown and Holiday Pay benefit the National Agreement created, the unique circumstances resulting from the layoff that had deprived the claimants of that benefit, and the demonstrated intent of the parties to the MOU to replace the lost benefit with the One Time Special Payment. Based on all of that, the Commission resolved the questions presented against coverage.
 {¶ 79} The Commission is not required to find in favor of coverage except when ineligibility for coverage is shown to a moral certainty. The Commission is charged only to resolve any material doubt in favor of coverage, and in so doing it must rely on the facts presented and is not bound by any particular nomenclature which parties adopt, or fail to. On this record, the Commission could reasonably find that the One Time Special Payment was remuneration for purposes of R.C. 4141.35(A)(5), notwithstanding the MOU's avoidance of any specific definition. Therefore, on the standard of Tzangas, we may not reverse.
 {¶ 80} The assignments of error are overruled. The judgment of the common pleas court will be affirmed.
Wolff, J. and Fain, J., concur.