OPINION
{¶ 1} This is an appeal by appellants, Jean L. Nicolas et al (collectively "appellants"), from a judgment of the Franklin County Court of Common Pleas, affirming a decision of the Ohio Unemployment Compensation Review Commission ("review commission"), in which it affirmed a determination by the Director of the Ohio Bureau of Employment Services, disallowing appellants' claims for unemployment compensation benefits for the week ending July 4, 1998.
 {¶ 2} The following background facts are taken from stipulated facts, the review commission's decision, mailed December 12, 2002, as well as the trial court's decision, filed June 22, 2004. General Motors Corporation ("GM") owns and operates several manufacturing facilities in Ohio, including plants in Mansfield, Parma, Lordstown and Defiance. Delphi Corporation ("Delphi") owns and operates several facilities in Ohio formerly owned by GM, including plants in Dayton/Moraine, Columbus and Sandusky. Appellants in the instant case are residents of Franklin County and/or were last employed as production and maintenance employees at a facility in Franklin County, and are represented by the United Auto Workers Union ("UAW").
 {¶ 3} GM facilities in Ohio receive parts from, or ship parts to, other GM plants. On June 5, 1998, employees represented by the UAW went on strike at the Flint Metal Center in Flint, Michigan. Six days later, union workers at the Delphi Flint East Plant also went on strike. Both of these plants were owned and operated by GM at the time of the strikes. Because the facilities on strike produced parts for other GM plants, parts shortages occurred at other facilities, including the Columbus plant, and appellants were on layoff status at various times during the strikes, from approximately June 5, 1998 through August 3, 1998; further, all claimants in this appeal were laid off during the week ending July 4, 1998.
 {¶ 4} In 1998, GM and members of the UAW were operating under a National Agreement ("national agreement") dated November 2, 1996. The national agreement designated the period from Monday, June 29, 1998, through Thursday, July 2, 1998, as "Independence Week Shutdown Period," and further designated the date of Friday, July 3, 1998, as "Independence Day holiday." Under the collective bargaining agreement, GM's UAW employees received 32 hours of pay for the Independence Week shutdown and eight hours of pay for the Independence Day holiday.
 {¶ 5} The national agreement contained several requirements for employees to receive payments for these two periods, including seniority and payroll status as of the date of the holiday. Employees were also required to have worked the last scheduled workday prior to and the next scheduled workday following the shutdown period and holiday in order to be entitled to compensation for these days. All claimants were laid off prior to the week ending July 4, 1998, and, therefore, did not work the days prior to and following the holiday and shutdown period.
 {¶ 6} The two strikes in Flint Michigan were settled on July 29, 1998; GM's Ohio workers were not involved in approving the settlement. As part of the negotiations to settle the strike, GM and the UAW entered into a "Memorandum of Understanding" ("MOU") on July 28, 1998. Under the terms of the MOU, appellants received a one-time special payment, in addition to their regular pay, for the payroll period ending August 9, 1998. The UAW initially asked GM to take union dues out of the one-time special payment, but, on August 17, 1998, GM and the union agreed to waive the dues payment. Payroll taxes were withheld from the one-time payments.
 {¶ 7} The MOU provided as follows:
As a result of these negotiations and without prejudice to the position taken by either party, and without setting any precedent in the disposition of any other case involving similar circumstances, the parties agree to the following:
Employees who were on strike or layoff status at General Motors locations due to the labor dispute at the Flint Metal Center and Delphi E Flint East and who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM — UAW National Agreement, shall receive a one time special payment in the amount they would have been entitled to had they not been on strike or layoff.
This payment will be made in an expeditious manner and taxed as a regular wage payment in accordance with Document No. 81 of the GM — UAW National Agreement.
This payment shall initially be made by General Motors. Thereafter, payments otherwise required by Paragraph III A of the Memorandum of Understanding Joint Activities, 1996 GM — UAW National Agreement, shall be waived until General Motors is reimbursed for the total amount paid to employees as a result of this Memorandum.
Further, the parties recognize that these payments may result in employees being ineligible for unemployment compensation already received. Employees impacted by such overpayment of unemployment compensation will be responsible to repay the State that provided the unemployment compensation.
 {¶ 8} Payments for the shutdown period were made to employees on August 13, 1998, or August 14, 1998, in the amount of 32 hours at an individual employee's regular rate of pay. Payment for the holiday was made at the same time, and represented eight hours at the regular rate of pay. GM made all normal deductions, including union dues, and the dues were later refunded to most claimants because they had not worked the minimum number of hours for union dues deductions under the agreement. All claimants were credited this week for seniority purposes.
 {¶ 9} GM provided a special designation for data processing purposes; specifically, the eight-hour payment was designated "MISCHOSP," while the 32-hour payment was designated "MISCIWSP." On employee paycheck stubs, those payments were combined and designated "MISC-ALLOTHER" for both payments. All claimants involved in the appeal received monies under the above designations in excess of their weekly benefit amounts.
 {¶ 10} Cheryl Ollia, GM's assistant director of labor relations, drafted the MOU and testified that it was "our intent that employees who received unemployment insurance compensation would not get a double payment for the same period." On August 5, 1998, Edward Jones, the supervisor of labor relations at GM's Lordstown assembly plant, received a one-page flyer at the plant's main entrance. The flyer contained the heading "INDEPENDENCE WEEK HOLIDAY PAY," and stated in part: "The International Union and Corporation have agreed to pay the negotiated settlement concerning the Independence Week Shutdown Week."
 {¶ 11} Appellants made claims for unemployment compensation benefits for the entire layoff period. GM challenged the payment of benefits for the week of June 28, through July 4, 1998, contending that the one-time special payment was holiday pay remuneration. On May 17, 1999, the Director of the Ohio Bureau of Employment Services (now part of the Ohio Department of Job Family Services, and, hereafter, referred to as "ODJFS") issued a determination of benefits, denying appellants' request for benefits for the week ending July 4, 1998, finding that appellants had received deductible income with respect to that period.
 {¶ 12} On April 10, 2001, the matter came for hearing before the review commission. On December 12, 2002, the review commission mailed its decision affirming the determination of ODJFS. The review commission's decision stated in pertinent part:
The question to be determined by the Review Commission is whether the monies received by claimants are deductible as remuneration in the form of holiday pay. This special payment was negotiated by General Motors Corporation and the United Auto Workers. The weight of the evidence before the Review Commission is that the purpose of this payment was to replace the lost Independence Week Shutdown Period pay and Independence Holiday pay. Certain prerequisites for receiving this pay could not be met by employees because of the strikes and layoff situations existing at the time. In the negotiation process, it appears that the parties agreed to waive these impossible prerequisites and pay the unemployed workers a special payment calculated to make them whole for loss of the holiday payments. Deductions were made by the employer in the same manner as regular holiday payments would have been handled and employees received credit, including additional vacation entitlement, under the National Agreement for these monies. The circumstances which allowed the employer to recoup these monies via reduced contributions to another fund does not alter the nature of the payments.
That the parties believed and intended these payments to replace the Independence Week Holiday pay is evidenced by Employer Exhibit #1, Shop Committee — Informational Flyer, issued August 5, 1998, wherein the following statement was made:
* * *
"The International Union and Corporation have agreed to pay the negotiated settlement concerning the Independence Week Shutdown Week. This payment will be included in the regular payroll checks on August 14, 1998. Even though you only receive one check, taxes will be deducted from the individual amounts of the two weeks, as per your regular payroll tax status."
 {¶ 13} On January 10, 2003, appellants filed a notice of appeal with the Franklin County Court of Common Pleas from the decision of the review commission. Appellants asserted that the review commission erred in finding that the one-time special payment was holiday pay under Ohio law, arguing that claimants performed no services during the week at issue, and that they received no "remuneration" during that week. By decision filed on June 22, 2004, the trial court affirmed the review commission's decision.
 {¶ 14} On appeal, appellants set forth the following five assignments of error for review:
1. The Trial Court erred in affirming the Decision of the Review Commission denying benefits to claimants, because they were totally unemployed under Revised Code Section 4141.01(M).
2. The Trial Court erred in affirming the Decision of the Review Commission denying benefits to claimants, because the one-time special payment was not holiday pay under Section 4141.31(A)(5) and could not be allocated to the week ending July 4, 1998.
3. The Trial Court erred affirming the Decision of the Review Commission denying benefits to claimants, where the special payment was a form of bonus, that could not be used to reduce benefits under Section4141.31(A)(5).
4. The Trial Court erred in affirming the Decision of the Review Commission denying benefits to claimants, because the special payment was not remuneration under Revised Code Section 4141.01(H).
5. The Trial Court did not liberally construe under R.C. 4141.46 the Appellants' claims for unemployment benefits.
 {¶ 15} Appellants' five assignments of error are interrelated and will be considered together. We begin by noting the applicable standard of review. Pursuant to R.C. 4141.282(A), "[a]ny interested party, within thirty days after written notice of the final decision of the unemployment compensation review commission was sent to all interested parties, may appeal the decision of the commission to the court of common pleas." If a trial court, upon appeal of a decision of the commission, finds that the commission's decision was "unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse, vacate, or modify the decision, or remand the matter to the commission." R.C.4141.282(H). The same standard applies to an appellate court's review.Tzangas, Plakas Mannos v. Ohio Bur. of Emp. Serv. (1995),73 Ohio St.3d 694, 697.
 {¶ 16} Under the first assignment of error, appellants argue they were "totally unemployed" under R.C. 4141.01(M). Appellants contend it is undisputed they performed no services for the week ending July 4, 1998, and, therefore, the dispositive issue is whether the one-time special payment constitutes remuneration payable with respect to the week of July 4, 1998, or as to the week in August 1998, when the payment was issued.
 {¶ 17} Appellants also argue that this is a case of first impression in Ohio, and, therefore, this court should look to other jurisdictions that have addressed this issue. Appellants note that at least three appellate courts in other states have dealt with the issue whether GM employees were entitled to unemployment compensation benefits under the same MOU. See, e.g., Gen. Motors Corp. v. Buckner (Mo.App. 2001),49 S.W.3d 753 (finding that special payment by GM as part of strike settlement was not "payable" during the Independence Week so as to make it deductible from unemployment benefits); Kitchen v. Emp. Security Bd.of Rev. (Kan.App. 2000), 9 P.3d 575 (holding that the one-time special payment was vacation pay attributable to Independence Week shutdown period, and, thus, such payment was deductible as wages from claimants' weekly unemployment compensation benefits); Hadlock v. Oklahoma Emp.Security Comm. (Ok.App. 2001), 23 P.3d 300 (affirming Board of Review's finding that one-time special payment was made with respect to week ending July 4, 1998).
 {¶ 18} Apart from the fact that those cases involve differing state statutes, we note that, subsequent to the filing of briefs in the instant matter, the Fifth District Court of Appeals in Futey v. Ohio Dept. of Job Family Srvc., Richland App. No. 04 CA 14, 2004-Ohio-5400, and the Second District Court of Appeals, in Ashwell v. Ohio Dept. of Job Family Srvc., Montgomery App. No. 20522, 2005-Ohio-1928, both rendered decisions affirming trial court decisions that affirmed the review commission's determination that GM's one-time special payment in August 1998 was holiday pay remuneration for the Fourth of July holiday, thus precluding claimants' from receiving unemployment compensation benefits. We also note that the appellants-claimants in Futey appealed that decision, but the Ohio Supreme Court declined further review. Futey v.Ohio Dept. of Job Family Srvc., 105 Ohio St.3d 1452, 2005-Ohio-763.
 {¶ 19} R.C. 4141.01(M) provides that "[a]n individual is `totally unemployed' in any week during which the individual performs no services and with respect to such week no remuneration is payable to the individual." Courts have interpreted this statutory provision to mean, "if a claimant either performs services, or receives remuneration, he is not unemployed." In re DeLuca (June 19, 1979), Franklin App. No. 79AP-28. See, also, Rini v. Unemployment Comp. Bd. of Rev. (1983),9 Ohio App.3d 214, 215 ("One who either performs services or receives remuneration in a given week is not `totally unemployed.'"). Pursuant to R.C. 4141.01(H), "`[r]emuneration' means all compensation for personal services, including commissions and bonuses and the cash value of all compensation in any medium other than cash."
 {¶ 20} In the present case, the trial court found that the language of the MOU and the testimony of Cheryl Ollia supported the review commission's determination that the parties intended to have the one-time special payment replace Independence Day shutdown pay. We note that, as part of the evidence in this case, the parties stipulated that, in lieu of Ollia's live testimony, the parties agreed to "substitute her entire testimony given on November 9, 1999 in a similar proceeding in Michigan,Willie Jackson, et al. v. General Motors Corporation, No. MOL 1999, 57622, et al."
 {¶ 21} During that proceeding, Ollia, the assistant director of labor relations for GM, testified that the intent of the one-time special payment was to make up for the lost Independence Week pay, and that it "was allocated for that period." (Tr. 42.) Ollia worked on drafting the language of the MOU, and she stated that the document "provided employees who were otherwise ineligible for the Independence week shutdown pay, by virtue of being on strike or layoff, with payment for that period." (Tr. 51.) The amount of payment was based upon "an employee's regular wage earnings," and the employee's wage rate was for "the period of June 29th to July 3rd." (Tr. 51.) She stated it was also intended that "employees who received unemployment insurance compensation would not get a double payment for the same period." (Tr. 39.)
 {¶ 22} Ollia noted that the issue of union dues was not addressed by the MOU; however, following the strike settlement, she had discussions with two representatives of the UAW in which it was agreed to have the union dues deducted out of the special payment, and that such dues "would be deducted for July * * * per the union's request." (Tr. 64.) Subsequently, union employees complained that they had not worked the minimum amount of time in July to require payment of the dues. As a result, Ollia had further conversations with UAW representatives, and "[t]hey were apologetic and recognized that for those employees who had less than 40 hours, then, for the month of July, that the union dues needed to be refunded[.]" (Tr. 67.) A second memorandum was prepared with respect to the issue of union dues.
 {¶ 23} Based upon a review of the MOU and other evidence presented, including Ollia's testimony, the trial court found that the commission's order was supported by evidence that: (1) appellants were paid at their base rate of pay, i.e., the same rate of pay at which they would have been paid for the Independence Week shutdown and the Independence Day holiday; (2) GM deducted taxes and other items from appellants' special payments in the same manner it would have done had they received Independence Week shutdown and Independence Day holiday pay; (3) appellants received wage-progression credit and accrual of vacation benefits in the same manner they would have under normal Independence Week shutdown and Independence Day holiday pay; (4) the language in the MOU "strongly implies" that the special payments were made to replace Independence Week shutdown and Independence Day holiday pay, and were not intended to be in addition to unemployment benefits; and (5) a flyer appearing to be from the UAW local leadership in Lordstown identified the special payment as Independence Week holiday pay, and stated that it resulted from negotiations over Independence Week pay.[1]
 {¶ 24} Upon review of the record in the instant case, we agree with the trial court that the review commission's finding that parties intended the one-time special payment to replace the lost Independence Week Holiday pay was not unlawful, unreasonable or against the manifest weight of the evidence. Here, the MOU specifically referenced the fact that the one-time special payment was for employees on strike or layoff status due to the Flint labor dispute "who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM — UAW National Agreement[.]" The MOU further provided that the parties "recognize that these payments may result in employees being ineligible for unemployment compensation already received." As noted by the trial court, appellants were paid at the same rate of pay they would have been for the Independence Week shutdown and the Independence Day holiday, and tax deductions, wage-progression credits and the accrual of vacation benefits were all handled by GM in the same manner for that particular week. GM classified the 32-hour payments in its records as "MISCIWSP," and the eight-hour payment as "MISCHOSP," which the court inFutey reasonably interpreted as "miscellaneous independence week special pay" and "miscellaneous holiday special pay." Futey, supra, at ¶ 21.
 {¶ 25} Appellants' argument that no remuneration was "payable" to them during the week ending July 4, 1998 is premised upon the fact that they could not meet, under the national agreement, the prerequisites for receiving the payments, i.e., due to the strike, they were unable to work the scheduled workday prior to and following the shutdown period and holiday.[2] Appellants maintain that it was not until after the MOU was executed (on July 28, 1998) that any amount was payable, and that GM "allocated" the payment to the week of August 9, 1998, when the checks were issued.
 {¶ 26} However, there was evidence supporting the review commission's finding that the parties, through the MOU, agreed to waive certain prerequisites under the national agreement that stood in the way of granting these workers Independence Week shutdown and Independence Day holiday pay. Further, under Ohio law, the date on which a payment is received is not dispositive. Pursuant to R.C. 4141.31(A)(5), benefits otherwise payable for any week are to be reduced by the amount of remuneration a claimant receives with respect to "[v]acation pay or allowance payable under the terms of a labor-management contract or agreement * * * which payments are allocated to designated weeks." Ohio Adm. Code 4141-9-05(A) provides that "[r]emuneration in the form of holiday pay will be applied to the week during which the holiday occurs as specified by state or national declaration, regardless of when such remuneration is actually received." Finally, Ohio Adm. Code 4141-9-04(B) states that "[r]emuneration may be paid in cash and may be denominated by terms such as vacation pay or allowance, separation pay, holiday pay, paid absence allowance, downtime paid absence allowance or short workweek pay."
 {¶ 27} In construing the above statutory provisions to the same stipulated facts as the instant case, the court in Ashwell, supra, at ¶ 57-59, held in relevant part:
The Independence Week Shutdown pay period identified in the National Agreement is the period of Monday, June 29 through Thursday, July 2, 1998. One of the holidays for which payment is specified by the National Agreement is July 4, 1998. The July 4 holiday was observed on Friday, July 3 in 1998. The MOU provides that eligible employees "shall receive a one time special payment in the amount they would have been entitled to receive had they not been on strike or layoff" during the Independence Week Shutdown and Holiday. Per O.A.C. 4141-9-05(A), the pay for the Independence Day holiday necessarily must apply to July 3, 1998, the last day of the Independence Week Shutdown and Holiday period that year.
The foregoing provisions support the conclusion of the Commission and the common pleas court that the One Time Special Payment was a form of vacation pay. The further question is whether, as vacation pay, it was allocated to the designated work week of June 29 through July 3, 1998.
To "allocate" means "to apportion for a specific purpose or to particular persons or things." Webster's Third International New Dictionary. Here, the One Time Special Payment was apportioned by recipient and amount to persons who, but for their inability to work the required prior and subsequent shifts because of the layoff, would have been entitled to receive Independence Week Shutdown and Holiday Pay in 1998 for the week designated. Therefore, the Commission could reasonably find, as it did, that the One Time Special Payment was allocated to the week designated. On the standard of review we are required by Tzangas to apply, we cannot find that the Commission's decision was unreasonable, unlawful, or against the manifest weight of the evidence.
 {¶ 28} We agree with the Ashwell court that, under the facts of this case, the review commission could have reasonably concluded that the one-time special payment was allocated to the Independence Week shutdown and Independence Day holiday, thereby constituting remuneration for purposes of R.C. 4141.31(A)(5).
 {¶ 29} Appellants' reliance on Akzo Salt, Inc. v. Ohio Bur. of Emp.Serv. (1995), 107 Ohio App.3d 567, does not dictate a different result. Under the facts of that case, the employer announced that its plant would be closed for approximately one month due to economic conditions and that, pursuant to a collective bargaining agreement, all laid-off employees would receive a lump sum payment for unused vacation pay. Some of the employees had previously scheduled their vacation for dates falling within the layoff period, while other employees had planned their vacation for after the layoff period. The court in Akzo Salt held that, as to the former group of employees, the reduction in unemployment benefits was lawful, as they expected to receive the lump sum payment during that time. As to the other employees, the court held that they had an expectancy of receipt of the monies at times other than the layoff period, constituting "accelerated payments to them of their vacation pay and as such did not constitute `remuneration' within the meaning of R.C. 4141.01(M)[.]" Id. at 572.
 {¶ 30} Thus, as to payments the employer "unilaterally attempted to allocate" for a vacation benefit as remuneration for the period in which it was paid, even though those weeks had not been designated for receipt by the labor agreement, "no allocation was shown." Ashwell, supra, at ¶ 68. In contrast, in the instant case, there was evidence before the review commission that the MOU, which is without dispute a "labor-management agreement, specifically allocated the payment to a designated week." Id.
 {¶ 31} We also find unpersuasive appellants' claim that the one-time payment was a "bonus." The court in Ashwell, supra, at ¶ 53, rejected this same argument, finding that, "per R.C. 4141.04(H)(2) a `bonus' is a form of remuneration, [and] [t]herefore, payment of a bonus renders an employee, even one who is laid-off, ineligible for benefits because he is not then unemployed." Further, the case relied upon by appellants, BuddCo. v. Mercer (1984), 14 Ohio App.3d 269, 277, is distinguishable, as in that case the employees had the right to select their period of vacation or to receive payments without taking time off from work, and the payments received, upon an employee's request, "were not related to an ascertainable week during which appellants lost wages." Id.
 {¶ 32} Appellants further raise the contention that, if the payment actually constituted holiday pay, GM would have been required to pay claimants from its general revenue. Appellants maintain, however, that GM was "excused" from payment of its contractual obligation to the Joint Activities Fund, also known as the "Nickel Fund."
 {¶ 33} The court in Ashwell also addressed and rejected this argument, noting, "R.C. 4141.35(A)(5) takes no account of the source of vacation pay or allowances, so long as the amount is payable under the terms of a labor-management agreement and allocated to designated weeks."Ashwell, supra, at ¶ 70. Thus, the court reasoned, "[r]eliance on the fact that the payment is the product of a labor-management agreement, as it was here, demonstrates that questions such as the source, amount, or payment terms are matters committed to the negotiating process, not ones that affect the application of R.C. 4141.35(A)(5)." Id. Similarly, the review commission found that "[t]he circumstances which allowed the employer to recoup these monies via reduced contributions to another fund does not alter the nature of the payments." We find no error with the review commission's determination that the nature of the payment itself was not altered by the fact monies were diverted from the Nickel Fund.
 {¶ 34} Appellants also contend that the review commission erred in relying upon evidence in the form of information contained in flyers distributed by the union and describing the payments as Independence Week shutdown and Holiday pay.
 {¶ 35} At the outset, we note that appellants did not challenge, before the trial court, the issue of the review commission's reliance upon the flyer. In general, a reviewing court will not consider issues a party fails to raise before the trial court. State ex rel. Quarto MiningCo. v. Foreman (1997), 79 Ohio St.3d 78, 81.
 {¶ 36} We further note that appellants do not appear to challenge evidence that a local union representative distributed the flyer to union members. On this point, the Ashwell court, at ¶ 76, noted there was "no dispute that the flyer was issued by a UAW local to UAW members who were laid off and eligible for the One Time Special Payment prescribed by the MOU." As such, the court held that the statements in the flyer qualified as non-hearsay admissions of a party-opponent under Evid.R. 802(D)(2)(d), and the court viewed the admission of the flyer as an issue of weight and credibility, rather than admissibility. We agree, and find no reversible error.
 {¶ 37} Finally, we do not find persuasive appellants' assertion that the review commission failed, pursuant to R.C. 4141.46, to liberally construe R.C. Chapter 4141. Although unemployment compensation statutes are to be liberally construed, neither the agency nor the trial court has a duty to construe facts more favorably to either party. Dailey v.Admr., Ohio Bur. of Emp. Serv. (Jan. 22, 1987), Cuyahoga App. No. 52633. See, also, Kosky v. American Gen. Corp., Belmont App. No. 03-BE-31, 2004-Ohio-1541, at ¶ 20 ("The fact that a court must liberally construe a statute in favor of a claimant does not mean it must liberally construe the facts in a particular case in favor of the claimant."). Nor is a court, under the guise of liberal construction, to read into a statute something that cannot reasonably be implied from the language of such statute. Szekely v. Young (1963), 174 Ohio St. 213, 218. In the present case, we do not find that the review commission violated the principle of R.C. 4141.46 in its application of the statutes and regulations to the facts, and we agree with the trial court that the review commission's decision was not unreasonable, unlawful, or against the manifest weight of the evidence.
 {¶ 38} Based upon the foregoing, appellants' five assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
Brown, P.J., Lazarus and Klatt, JJ., concur.
[1] In Futey, supra, at ¶ 20-21, the reviewing court noted similar findings by the trial court in affirming the decision of the review commission, i.e., (1) in settling the strike, the UAW negotiated a new agreement allowing UAW members to be eligible to receive a week of holiday pay for the Fourth of July week; (2) the week's pay was calculated in exactly the same manner as the holiday payment would have been and by reference to the same dates and payroll status for each employee; (3) the Fourth of July week was counted in the accrued seniority and vacation rights for each employee in the same manner as holiday pay would have been; (4) the parties expressly recognized the payment might result in employees being ineligible for unemployment compensation in the week they received it; (5) the employees received more by getting a week's holiday pay at the auto worker's pay rate than they would have received for a week of unemployment compensation; (6) UAW newsletters announcing the settlement referred to the payments as Independence Week holiday pay; (7) GM classified the 32-hour payments in its own records as "MISCIWSP," which the court translated as miscellaneous holiday special pay; (8) the eight-hour payments were listed in GM records as "MISCHOSP," which the court translated as miscellaneous holiday special pay; and (9) both GM and the UAW viewed the one-time payment as Independence Week pay.
[2] Appellants also argue that a payment is not remuneration, under R.C. 4141.01(H), where no "individual services" are performed. However, the Ohio Supreme Court has rejected such an interpretation. UnitedSteelworkers of America AFL-CIO v. Doyle (1958), 168 Ohio St. 324
(laid-off employee retained status as an available employee during week off, and, therefore, supplemental benefits received constituted remuneration for personal services). See, also, Ashwell, supra, at ¶ 44 ("as `personal services' appears in the definition of remuneration in R.C. 4141.01(H)(1), it is not limited to engaging in some productive activity").